UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LATRAVIETTE SMITH-WILSON and
CHARISMA DEBERRY,

                               Plaintiffs,

                - against -

HORIZON MEDIA HOLDINGS LLC and
HORIZON MEDIA LLC

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

           COMPLAINT

           PLAINTIFFS DEMAND A
<u>TRIAL BY JURY</u>

       Plaintiffs Latraviette Smith-Wilson and Charisma Deberry, by their attorneys, Vladeck, Raskin & Clark, P.C., complain of defendants Horizon Media Holdings LLC and Horizon Media LLC (collectively "Horizon") as follows:

NATURE OF CLAIMS

       1.     When Horizon hired Smith-Wilson as the industry's first Chief Marketing & Equity Officer in 2022, it publicly touted her appointment as a bold commitment to equity and transformation. Horizon claimed to be an industry-leading example of opportunity and inclusivity, even declaring "DEI is our DNA," but unfortunately behind closed doors, those words were empty, and that DNA unraveled quickly. In fact, Horizon's most senior executives—including Founder & CEO Bill Koenigsberg, President Bob Lord, and EVP of HR Nancy Galanty—engaged in a sustained, escalating campaign of race- and gender-based discrimination constituting a hostile work environment and retaliation. Smith-Wilson was not punished for failing to lead; she was punished for doing so. For advocating accountability, for raising employee concerns about

discrimination, for seeking to remedy issues uncovered in investigations and employee surveys related to treatment of women and people of color, and for embodying the very equity values Horizon publicly promoted but privately undermined. By April 2025, Horizon abruptly dismissed Smith-Wilson, under the false pretense of "restructuring"—without prior warning, performance documentation, or legitimate business rationale. Less than a month later, Horizon announced a new enterprise-level Chief Marketing Officer, falsely claiming it as a "first" and "new" role. Horizon also confirmed that it would be hiring a Chief Equity Officer. Far from a genuine restructuring, it was a pretext manufactured to conceal discriminatory and retaliatory motives.

2.      Deberry, who reported to Smith-Wilson and led the strategic communications function, also experienced discrimination and retaliation. Indeed, in her first presentation meeting with Koenigsberg in March 2023, he told her that her job was to "seduce" reporters in order to secure favorable media coverage and increase the company's media impressions, a statement that reduced her to a stereotype and sexualized her professional role. Despite repeatedly delivering award-winning communications outcomes, Deberry has endured discriminatory treatment, unlawful retaliation, and a toxic workplace. While she remains employed by Horizon, she faces ongoing bias and retaliation via exclusion, marginalization, and public diminishment at every turn.

3.      Throughout their tenures, defendants subjected plaintiffs to a hostile work environment marked by race and gender bias, racially coded critique, performative support, and disparate treatment. Defendants denied plaintiffs resources that they granted to departments led by White male peers, subjected them to performance scrutiny their White counterparts never faced, held them accountable for work that was the responsibility of their White male peers, and disparaged them for work that was praised by others and won national recognition. Defendants

2

criticized and questioned them in a disrespectful manner in front of other employees and repeatedly accused them of not "understanding" Horizon's tools and technology, something that was not done to White men. This occurred despite evidence that those tools were incomplete, misrepresented, not at the operational stage that Koenigsberg purported them to be or with the functionality that Horizon was claiming them to have to press and clients. In addition, Koenigsberg accused Deberry of not being "articulate" when she offered strategic insights. When Smith-Wilson presented information to address misrepresentations regarding her team or herself or asked clarifying questions, she was branded "defensive" or "incompetent." Meanwhile, similarly situated White men were praised for making the same statements. This dual standard was pervasive and intentional. Horizon has also taken actions that have harmed plaintiffs' reputations.

4.     In early 2024, a White woman who reported to Deberry resigned, explicitly citing the inappropriate conduct of senior executives and the mistreatment of Black women at Horizon—specifically Smith-Wilson and Deberry—as a driving factor in her decision to leave. Horizon's head of Human Resources, Galanty, initially denied the existence of any concerns resulting from the interview, and reversed course only after repeated questioning by Smith-Wilson. During a conversation initiated by Galanty in which Galanty said the reported concerns "tracked" with information of which she was aware, Deberry cautiously corroborated aspects of what the departing employee reported. Although Galanty agreed to Deberry's request for confidentiality, Galanty breached that trust and shared Deberry's comments with leadership, then tried to coerce her into filing a formal complaint. When Deberry refused, citing her fear of retaliation, Galanty labeled her "angry"—a stereotype deployed to discredit Black women. Deberry filed a formal complaint about Galanty's handling of the situation, and Horizon closed the matter after a perfunctory investigation led by Galanty's team and without any accountability. When Smith-

Wilson spoke with Galanty earlier in the process to ensure that Deberry was treated with respect and that Horizon focus on the broader pattern of the treatment of Black women at Horizon, Galanty was hostile to Smith-Wilson.

5.     When Lord assumed the role of President of Horizon Media Holdings in January 2025, the environment deteriorated further. Within weeks, he joined Koenigsberg in targeting Smith-Wilson—dismissing her nationally recognized Marketing & Equity strategy and her team's accomplishments, falsely accusing her of incompetence, and contradicting directives previously given by Koenigsberg. On April 16, 2025, Lord fired Smith-Wilson without cause or warning and then replaced her within weeks with an Asian woman with substantially less experience than Smith-Wilson, falsely presenting the new hire as Horizon Media Holdings' "first CMO"—despite Smith-Wilson holding a CMO-equivalent role in that capacity for more than three years. This was not only reputationally damaging. The message was clear: Horizon would not only erase its highest-ranking Black woman executive. It would rewrite history to do so.

6.     Since Smith-Wilson's dismissal, the retaliation against Deberry escalated. She was stripped of key responsibilities, excluded from major events, and denied access to information and platforms essential to her role. She was blamed for decisions she did not make, removed from projects she led, and repeatedly attacked by the very executives she was responsible for promoting. Deberry has been subjected to baseless attacks on her character and professional integrity—both internally and externally—resulting in reputational damage. Despite being the only remaining Black woman in an enterprise executive role at Horizon—and the only executive to own a holdings-level communications function—she received no promotion, no additional resources, and no protection from the increasing retaliation that followed her refusal to remain silent.

7.      Still, despite every roadblock, Smith-Wilson's team—including Deberry—delivered measurable, highly effective results for Horizon. The team spearheaded and launched several enterprise-wide initiatives that modernized the company's external and internal brand presence after years of stagnation. These included the development of a new award-winning corporate website, the implementation of a new intranet system, the creation of a centralized communications request platform to streamline and automate internal workflows across the organization, the launch of an enterprise-wide mentorship program, and the company's first-ever diversity benchmarking survey.  Under their leadership, Horizon reached #1 share of voice in the industry (reflecting media coverage, brand presence, or online conversations relative to competitors) in 2023, tripled media coverage of its thought leadership and research, secured over 140 placements annually, and increased engagement on its social platforms by 70% year over year. Their efforts directly contributed to a surge in industry visibility, including coverage and commentary in top-tier publications such as Ad Age, Adweek, Bloomberg, CNBC, Forbes, Fortune, New York Times, USA Today, and others, defining the agency's external presence.  The Marketing & Equity team also received industry recognition for its work. These achievements were realized despite Horizon's major client losses, limited new business wins, and declining employee morale, as reflected in internal engagement surveys.  Horizon's executives accepted the accolades and acclaim – but punished the architects.

8.      Plaintiffs bring this action to remedy defendants' gender and race discrimination and retaliation, including creation of a hostile work environment.  Specifically, plaintiffs bring this action to remedy violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); New York State Human Rights Law, N.Y. Executive Law § 296 et seq. (the "State Law"); the New York City Human Rights Law, Administrative Code of

the City of New York § 8-107 <u>et seq.</u> (the "City Law"); and the California Fair Employment and Housing Act, Cal. Gov't Code § 12900 <u>et. seq.</u> ("CA Law"). Plaintiffs seek compensatory and punitive damages, equitable and injunctive relief, and attorneys' fees and costs.

<u>JURISDICTON AND VENUE</u>

9.     This Court has jurisdiction over plaintiffs' Section 1981 claim under 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over plaintiffs' State Law, City Law, and CA Law claims because these claims closely relate to the Section 1981 claim, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the defendants' principal office is in New York, they regularly do business in New York, New York, and many of the acts of discrimination and retaliation occurred within the Southern District of New York.

<u>PROCEDURE</u>

11.     Pursuant to Section 8-502(c) of the New York City Human Rights Law, plaintiffs will cause to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

12.     On September  2, 2025, plaintiff Deberry filed a charge with the California Civil Rights Department.

<u>PARTIES</u>

13.     Smith-Wilson is a Black woman who worked for defendants from February 2022 until they terminated her employment, effective April 25, 2025.  She is a resident of New Jersey and worked for defendants in New York.

6

14.     Deberry is a Black woman who has worked for defendants since December 2022. She is a resident of California and works for defendants in California and New York.

15.     Horizon Media Holdings is a media and marketing company that has several subsidiaries. It is a limited liability company formed under the laws of Delaware with its principal place of business in New York.

16.     Horizon Media is a media agency and the largest subsidiary of Horizon Media Holdings. It is a limited liability company formed under the laws of New York with its principal place of business in New York.

FACTUAL ALLEGATIONS

Plaintiffs' Backgrounds

17.     Smith-Wilson is a nationally recognized marketing and communications executive with over 25 years of experience spanning Fortune 100 companies, media and agency conglomerates, and global consumer brands. Prior to joining Horizon, she was Chief Strategy & Engagement Officer at Essence Ventures and Chief Communications & Strategy Officer for Essence Communications. Before that, Smith-Wilson was Senior Vice President, Communications & Strategy, Office of the CEO, at Sundial Brands and was a core executive team member during Sundial's acquisition by Unilever, the largest consumer packaged goods deal for a Black-owned company. She has also had leadership roles across agencies, corporations, and NGOs, including as Senior Advisor to the President & CEO of the National Urban League; Vice President, Global Diversity & Inclusion at American Express; and Senior Vice President, Global Marketing & Communications, and National Vice President, Multicultural at Edelman. Earlier in her career, she also worked for Deloitte, and began her career in journalism.

18.     Smith-Wilson has received numerous awards and recognition of her accomplishments, including Ad Age Leading Women, Advertising Week Future is Female, PRWeek Women of Distinction, Campaign US Top 40 Over 40, Chief Marketer Top Women in Marketing, ColorComm Black Women Making History Now, and Cynopsis Top Women in Media. She has published articles on leadership, innovation, and inclusion, and spoken at CES, SXSW, Advertising Week, Afrotech, and other global events.

19.     Smith-Wilson has a double BA, in English and Communications, from Wake Forest University and an MA in Journalism from New York University. She graduated from the CEO Program at University of California, Berkely, Haas School of Business, where she also received an executive education certificate in Emerging Tech Strategies: Harnessing AI, IoT, Web3, and Beyond.

20.     Deberry has over 15 years of experience in communications, public relations, journalism, and social media, including leading high-profile campaigns for Fortune 100 companies across the media, defense, and consumer sectors. Prior to joining Horizon Media, she served as Senior Advisor to Kanye West, providing strategic communications counsel at the intersection of brand, culture, and public affairs. She was previously the Global Social Media Director for Essence Ventures, where she oversaw the social strategy for a portfolio of culturally significant media properties. Before that, Deberry served as Senior Public Relations Principal at Northrop Grumman, where she translated more than $150 billion in classified satellite and aerospace technologies into publicly consumable narratives for national and trade press. In that role, she collaborated with key partners including NASA, SpaceX, and the United States Space Force, earning a reputation as a trusted communications lead on mission-critical national defense projects. Her background also includes serving as Senior Social Events Editor at Essence

Communications and as Community and Press Manager at NBCUniversal. Deberry is a published journalist with over 100 bylines across lifestyle and academic outlets. She was also the official social media correspondent for the Emmy Award–winning, nationally syndicated daytime talk show "The Real," and has been featured in media outlets including NBC, FOX, and The New York Times. In addition, she has been hired as a brand influencer for leading companies such as Coca-Cola, Starbucks, Pine-Sol, and WeWork.

21. Deberry has also been recognized with numerous awards, including Campaign's Inspiring Women Honoree, ADCOLOR Leaders Class, 3X Communicator award, Anthem award, 2x Webby award nominations, 100 Black Men of America Community Leadership award, Urban League San Diego's Top 30 Under 30, and NBC Universal "Know Your Value" honoree.

22. Deberry has a BA in Public Relations from Hampton University and an MPA in Public Administration from Southern University. She studied Communications Management at the University of Southern California and completed the prestigious Women of Color Leadership Program at Harvard Business School.

<u>Horizon</u>

23. Koenigsberg founded Horizon in 1989. Horizon is one of the largest media agencies in the United States and the largest independent one in the world, representing Spectrum, Capital One, Paramount+, NFL, FanDuel, TIAA, Lionsgate, Live Nation, SharkNinja, ADT, Tropical Smoothie, Revlon, PrizePicks, Kohl's, AMC Networks, Honda, Warby Parker, and more.

24. Horizon Media Holdings, the privately-held umbrella organization that includes Horizon Media—the world's largest independent media agency—also houses affiliate agencies including Horizon Next (full-service marketing); Horizon Commerce (commerce); One

Horizon (full-service advertising); HS&E (sports and experiential); Blue Hour Studios (social agency); 305 (multicultural); and Green Thread (B2B marketing).

25.    Horizon claims to be "people first" and has publicly declared itself as "an agency of belonging." Internally, however, Horizon operates as an insular and racially homogenous organization, with White men dominating the most senior executive roles and decision-making. Horizon's C-Suite has historically excluded people of color, and Smith-Wilson was the first and only Black woman to ever hold an Executive Board position.

<u>Horizon Hires Smith-Wilson for a Role She Created</u>

26.    In or about August 2021, an executive recruiting firm hired by Horizon reached out to Smith-Wilson for the open position of Chief Marketing Officer for all of Horizon. After some initial discussions, Horizon told Smith-Wilson that the role of Chief Diversity Officer was also open. Smith-Wilson told them that she was not interested in the CDO role unless it would be approached differently than traditional DEI efforts; e.g. via an enterprise business lens and not primarily HR. Koenigsberg was intrigued by her idea and said that if she was willing to do it, "we want to do it with you." But while Horizon welcomed the symbolism, it would ultimately turn her very success against her.

27.    Smith-Wilson created the new role of Chief Marketing & Equity Officer— celebrated as a first of its kind in the industry and broader corporate America—and she developed the model for the team. She began the new role for Horizon on February 14, 2022.

28.    Although Smith-Wilson was hired as Chief Marketing & Equity Officer to develop the function from the ground up, she was never approved to hire any marketing roles to build the capacity of the team. From the outset of Smith-Wilson's tenure in February 2022, her team was consistently under-resourced. Horizon repeatedly denied Smith-Wilson the necessary

headcount and resources to execute on the expanded scope of the function and strategy. Her enterprise-wide scope spanned corporate marketing, communications, social media, executive visibility, experiential, and DEI for the Horizon Media Holdings full enterprise, including Horizon Media and at minimum, seven additional affiliates. But of the 11 identified marketing and communications roles to execute that were outlined against the expanded strategy, only two were ever approved. Other teams led by White men received greater headcount and resources for far narrower job scopes.

29.    At the direction of Koenigsberg, from February through May 2022, Smith-Wilson attended about 80 onboarding sessions with key agency leaders and teams across all affiliates.

30.    During this period, Smith-Wilson also led a brand perception survey, insights from which she relied upon in developing strategy.

31.    On June 28, 2022, Smith-Wilson presented the Marketing & Equity strategy to Koenigsberg; then-Chief Talent Officer Eileen Benwitt; the then-Chief Development Officer; and Chief Financial Officer/Chief Operating Officer Vincent O'Toole. Her presentation was well-received.

32.    In late September 2022, Smith-Wilson presented her strategy to the Executive Board. At that time, the Executive Board positions included Chief Executive Officer; Chief Talent Officer; Chief Investment Officer; Chief Development Officer; Chief Business Solutions Officer; Chief Operating & Financial Officer; President, Horizon Next (now President Global Chief Client Officer); Chief Digital Officer; President, Western Region; Chief Strategy Officer; and Chief Marketing & Equity Officer.

33.    In January 2023, Horizon gave Smith-Wilson her first budget for moving forward with her strategy.

<u>Smith-Wilson is Under-Resourced and Excluded</u>

34.    From the beginning, Smith-Wilson raised concerns, including in communications to Koenigsberg, O'Toole, and other members of the Executive Board, about the resources allocated to her given the expanded scope developed for the new function. Koenigsberg generally would not respond and, when he did, he responded by saying "the function" never had a lot of people, ignoring that the function and enterprise strategy of the team were new and broader responsibilities, along with increased demand across the enterprise. When Smith-Wilson explained to Koenigsberg the resource constraints of the team, at times he would direct her to advise the teams that "not everything will be released" because we are "going for quality vs. quantity." However, at the same time he accused her of not delivering or of having "gaps" in public relations ("PR") and marketing, with no acknowledgement of the lack of resources, especially between February 2024 and April 2025 when Smith-Wilson's team consisted of one marketing lead and one communications lead with no internal team support.

35.    From the start, Smith-Wilson was excluded from critical internal conversations, even those concerning her own areas of responsibility. On August 29, 2022, an anonymous letter titled "The Cancer Within Horizon" (the "Cancer Letter") was sent to Koenigsberg, Benwitt, and the then-HR VP. The letter alleged mistreatment of people of color and a hostile work environment for those employees within Horizon, and specifically Horizon Next Video Investment, led by Gene Turner, President. These executives shared the letter with the Legal and IT departments on August 30, 2022. Although Smith-Wilson was responsible for Equity, no one provided her with a copy of the letter or told her about it at that time.

36.     Almost a month later, on September 23, 2022, the letter reached LinkedIn before it was sent to Smith-Wilson, as a LinkedIn account publicly described and posted the Cancer Letter. Only at that point, did Horizon Legal and HR include Smith-Wilson, who then began addressing the issue.

37.     Benwitt; Nancy Galanty, then an SVP in HR and now EVP of Talent; and Scott Hazlett, Associate General Counsel, wanted to hire an outside investigator Horizon had used before to investigate the allegations in the Cancer Letter. However, employees of color had told Smith-Wilson that they had concerns that nothing ever happened with Horizon investigations into such issues. At Smith-Wilson's urging, Horizon hired an outside law firm to conduct the investigation. As the investigation progressed, Horizon executives, particularly in HR, questioned Smith-Wilson's judgment without basis and minimized her authority.

38.     In April 2023, Smith-Wilson sent the entire agency recommendations resulting from the investigation, including conducting ongoing anonymous DEI surveys to audit progress and provide recommendations for coaching and training, exploring DEI workshops for leadership, conducting compensation reviews at least biennially, clarifying promotion and compensation processes, widening applicant pools, clarifying policies and procedures for escalating concerns, and expanding the Employee Relations Council.

<u>Horizon Hires Deberry</u>

39.     In fall 2022, Smith-Wilson recruited Deberry for the position of VP, Strategic Communications & Engagement. Deberry began working for Horizon in the role on December 5, 2022. Deberry was responsible for overseeing a new enterprise communications function across Horizon and its eight affiliate companies, largely on her own, including PR, internal communications, social media, awards, and partnerships.

40.     Deberry was based out of Horizon's Los Angeles office, but came to the New York office at least once a quarter.

41.     In March 2023, in Deberry's first presentation meeting with Koenigsberg, with Smith-Wilson present, he told Deberry that her job was to "seduce reporters" to garner favorable coverage. Seeing Deberry's and Smith-Wilson's visibly surprised reactions, he followed up that Deberry was to "work her magic" and that she "knew what [he] meant." Similarly, in November 2024, in discussing an awards submission with Smith-Wilson, Koenigsberg told her, "I brought you in here because you got a set of whatever. And I want you to like, you know, think about that."

<u>Hostility to DEI, Continued Exclusion, and Differential Treatment</u>

42.     In early 2023, Smith-Wilson learned that David Levy, who headed the Horizon affiliate HS&E, spoke with a PR consultant who reported to Smith-Wilson, and told the consultant they could "figure things out" without Smith-Wilson and that they did not need her to see or approve materials they developed. Levy and the consultant are White men. When Smith-Wilson learned of this, she sent an email to Koenigsberg, objecting to Levy going around her and excluding her. Koenigsberg told Smith-Wilson that they would connect to find a way forward to manage. But the only action Koenigsberg took was to give Levy the budget and resources for HS&E to hire its own PR person, at a time when Koenigsberg was denying Smith-Wilson money and resources to build the team she had identified from the beginning would be needed to fully execute the enterprise strategy. Koenigsberg gave Smith-Wilson budget to hire only one person to cover all of the enterprise's communications.  Koenigsberg allowed Levy to continue to exclude Smith-Wilson from HS&E's communications, despite it falling within the scope of her responsibilities.

43.    In spring 2023, Smith-Wilson's team launched Horizon's first diversity and culture benchmarking survey, immediately after sharing the recommendations that followed the investigation. They worked with a globally recognized company with expertise in measuring, tracking, and improving inclusion. The survey was the foundational work for the team's strategy to ensure DEI was an enterprise-wide effort across teams and the business.

44.    In January 2023, during a meeting for the creation of a new website, Deberry reiterated the strategic need for an improved website. In response, Koenigsberg said that he needed a more "articulate" description to consider the proposal. A White man then repeated the same point Deberry made, almost verbatim, except adding something like, "I think Charisma is saying . . . ." Koenigsberg accepted his explanation without critique. On multiple other occasions, after Deberry outlined her strategy on a matter, Koenigsberg responded that he needed to hear her strategy in a more "articulate" way.

45.    In a meeting in July 2023, the first results from the diversity and culture survey were shared with Koenigsberg, Benwitt, O'Toole, and Galanty. Quantitative highlights of the survey reflected an overall inclusion score that was below the industry average score, and the overall business integration scores showed a valuing of DEI among employees, but a lack of understanding in how to include it in day-to-day roles, and a lack of managers setting DEI expectations. This is where Smith-Wilson and her team began to focus the enterprise work to close the gap between understanding value and implementation. Areas of opportunity were identified as cultural inclusivity, career development, fair management, DEI education, and the discrepancies in experience between demographic groups.  Qualitative highlights of the survey heavily cited the desire from employees for broader team camaraderie and their observed lack of inclusion from higher levels of the organization. Employees most cited the need for increased organizational and

leadership diversity, DEI training, and addressing hiring/recruiting biases. Koenigsberg immediately tried to discredit the benchmarking baseline and participation rates to discredit the findings during the presentation with the company's female co-founder and COO present. The findings were statistically significant and had a confidence level of 95 to 99 percent. The company that Smith-Wilson used was the world's first AI-powered diversity benchmarking and solutions platform, created in partnership with renowned academic institutions to identify relevant themes, issues, and recommendations.

46.    In October 2023, after the Hamas attacks in Israel on October 7, 2023, an industry colleague reached out to Koenigsberg about signing onto a pledge that the Anti-Defamation League circulated. Koenigsberg forwarded the email to Smith-Wilson, Benwitt, and Galanty. Collectively, they agreed that Horizon was already doing or engaged in most of the actions being called for in the pledge and signing it might suggest they had not been doing so. Koenigsberg was aware and did not object. Approximately a month later, Smith-Wilson then received a letter from a group of Jewish employees at Horizon urging the agency to sign the pledge. Smith-Wilson explained why Horizon had not signed. The employees then complained to Chief Investment Officer David Campanelli, a White man on the Executive Board. Campanelli reached out to Smith-Wilson to share the concerns. Smith-Wilson made Koenigsberg aware of her planned response to the Jewish employees who had raised concerns in advance of her communications with them, and he did not raise any issues with her plan. She remained in contact with Koenigsberg and Campanelli as she, her team, and HR continued to navigate the issue, including providing an update to Campanelli on December 14, 2023, to which he replied on the morning of December 15, 2023, "Thank you. I appreciate the continued engagement on this important topic."

47.    The last Executive Board meeting of 2023 was held on the morning of December 15, 2023. At the end of the meeting, Koenigsberg said he understood there was an issue with some of the Jewish employees and asked for more information. He did not acknowledge any prior awareness of the issue, even though Smith-Wilson had updated him during bi-weekly team updates and in emails. Campanelli then misrepresented what had occurred and what Smith-Wilson had told the employees. Smith-Wilson was forced to defend herself publicly in the meeting, including pulling up email communications to read to the entire Board what she had communicated verbatim to refute Campanelli's false accusations. Koenigsberg ignored everything Smith-Wilson said. Instead, referring to Campanelli's accusations, which he accepted as true (despite them being factually refuted), he told Smith-Wilson that as long as he "owned the company, [he] would make these decisions." Smith-Wilson said that Campanelli was not accurately portraying what had occurred and that she did not appreciate the way it was being misrepresented in an Executive Board meeting. Koenigsberg then asked Smith-Wilson for next steps, which she shared. Koenigsberg then ended the meeting. Another Executive Board member later commented to Smith-Wilson about the meeting being "a shitshow and set-up." Smith-Wilson never observed that sort of coordinated, false attack on the White men on the Executive Board.

48.    After the Executive Board meeting, Smith-Wilson immediately sent Koenigsberg a draft of a comprehensive end-of-year email that she had already prepared for him to address some of the concerns the employees had expressed. The email was written to come from Koenigsberg to employees to quell the concerns bubbling among Jewish and Muslim employees. Koenigsberg disregarded Smith-Wilson's email and sent his own. Days later, several employees sent emails to Smith-Wilson's team noting that Koenigsberg's communication had made matters worse.

49.     On December 5, 2023, Smith-Wilson's team led an all-agency Town Hall, reporting on their accomplishments. The team demonstrated the strong results they had achieved, despite operating at 25-40% of the team's planned headcount. The next day, Koenigsberg sent Smith-Wilson an email insisting on proof for the data shared during the Town Hall meeting. Smith-Wilson sent him the backup for the data. He never responded. Smith-Wilson never observed Koenigsberg question White male executives in this manner.

50.     Koenigsberg developed a pattern of lobbing unsubstantiated criticisms at Smith-Wilson and/or her team based on what he claimed to hear "from his leadership team," which consisted of Smith-Wilson's peers. However, when Smith-Wilson provided evidence to the contrary, Koenigsberg dismissed her factual assertions, even chastising her, and referring to her as defensive for addressing and providing factual accounts of the falsehoods with which he confronted her.

51.     In December 2023, during a discussion that included Horizon's awards strategy, Karen Hunt, President of the Western Region, who is White, said that more women needed to be highlighted. Smith-Wilson noted that women were already being submitted and noted that she herself had won prestigious honors such as Campaign's 40 over 40 and Adweek's Future is Female, accolades that also positively reflected on Horizon, Hunt replied, "We need awards not just for diversity, but for our work." Hunt's remark not only mischaracterized Smith-Wilson's accomplishments and the criteria for the awards, but also falsely framed them as diversity-based, rather than earned through leadership, strategy, and impact.

<u>Horizon Retaliates When Plaintiffs Oppose Discrimination</u>

52.     In January 2024, a White woman with the title PR Manager, who reported to Deberry, resigned, effective February 2024. Defendants had hired her in April 2023.

53.     This PR Manager had an exit interview with an HR representative and completed an exit questionnaire in which she complained about the discriminatory treatment of Black women at Horizon, particularly Smith-Wilson and Deberry. She named some specific White, male executives, including Turner, at the time President of Horizon Next, now Global Chief Client Officer, Horizon.

54.     The PR Manager told Deberry about her exit interview and what she put in writing. Deberry shared the information with Smith-Wilson. Smith-Wilson was surprised that HR had not told her about an exit interview and questionnaire that related to the DEI observations and experiences the PR Manager experienced, as it was not only her area of responsibility, but directly affected her team. The PR Manager also told Smith-Wilson about her exit interview.

55.     In early February 2024, Smith-Wilson asked Galanty about the exit interview and questionnaire. Galanty initially said she did not know about it and dismissed the concerns. Galanty then got back to Smith-Wilson and said the PR Manager did not raise any issues that rose to the level of discrimination claims or cultural bias, including the treatment of Black women.

56.     After Smith-Wilson's persistence and multiple written and verbal follow-ups, Galanty furnished not only a recap of the PR Manager's exit interview but also shared the comments she had made to the HR Representative during her exit interview. Smith-Wilson asked if any information in the exit interview had been redacted; Galanty confirmed it had not. In the shared recap and subsequent conversation, it was subsequently revealed that the PR Manager did in fact raise concerns that rose to the level of discrimination claims and cultural bias, which Galanty then acknowledged as "concerning."

57.     Upon information and belief, Galanty never reached out to the PR Manager following her exit interview, nor did anyone else in HR. However, Galanty did initiate a conversation with Deberry, during which she asked whether Deberry had any experiences that corroborated the PR Manager's statements. Galanty told Deberry some of the comments made by the former PR Manager, including her written concerns and comments during her HR exit interview that White executives at the company had an aversion to Black female leaders. In response, Deberry said that she would respond to Galanty's request for information about her experience, but she was concerned about confidentiality and potential retaliation. Galanty assured Deberry that any information she provided would be kept confidential and said Horizon had a policy against retaliation.

58.     Relying on that assurance, Deberry shared experiences in which she believed she was treated differently due to her race and/or gender that aligned with the departing PR Manager's observations, particularly regarding the treatment of Black women at Horizon. During the conversation, Galanty mistakenly referred to the PR Manager as a Black woman. Deberry corrected her, telling her the PR Manager was White. Galanty appeared surprised by this clarification. Upon hearing it was a White woman who had raised the concerns, Galanty told Deberry that, under company policy, Deberry would now be required to file a formal complaint. Deberry said that while she was willing to provide context and support efforts to address systemic issues, she did not want to initiate a formal complaint herself. She said that she was concerned that doing so could expose her to retaliation and jeopardize her ability to effectively perform her role.

59.     Within 24 hours of the aforementioned conversation, Deberry became aware that Galanty had disclosed the substance of their discussion—despite her explicit assurances of confidentiality—both to Smith-Wilson and to Koenigsberg.

60.     Deberry told Galanty that she was deeply troubled by Galanty's breach of the confidentiality she had expressly promised during their prior conversation. While Galanty did not explicitly confirm that she had disclosed Deberry's statements to Koenigsberg, she did not deny it. Instead, she repeatedly pressed Deberry to disclose how she knew or suspected that Koenigsberg had been informed—stating that it was Deberry's responsibility to explain her reasoning. Deberry declined to engage further on the matter and told Galanty that she could no longer trust her.

61.     Deberry also reported the breach of confidentiality to Smith-Wilson, explaining that Galanty had pressured her to file a formal complaint despite her clearly stated wishes not to do so. She reiterated her concerns regarding potential retaliation, the security of her role, and her ability to continue performing her duties effectively.

62.     Smith-Wilson met with Galanty on Friday, February 9, 2024, to try to address Deberry's concerns and map a productive path forward. Smith-Wilson said she wanted to discuss how to address the broader, underlying issues raised by the PR Manager and Deberry, while being sensitive to the treatment of an employee who was adamant she did not want to make a complaint. Galanty repeatedly spoke of how she was "leaning in," and disputed that she had promised Deberry confidentiality. Galanty also referred to Deberry as "angry." Smith-Wilson responded that Deberry did not present as "angry" in their discussions. Galanty repeatedly questioned Smith-Wilson's judgment and competence regarding the handling of the issue when Smith-Wilson did not agree with her approach. Smith-Wilson suggested that the three of them have a meeting the following Monday to sort out what had happened, and align on the best path forward. Galanty agreed to the meeting but then canceled it via email on Monday morning, saying that she was starting an investigation. The three never met to resolve the matter.

63.    On February 21, 2024, Deberry participated in the filming of a video featuring Koenigsberg as part of Horizon's brand positioning content for its website and other assets. During the shoot, Koenigsberg repeatedly deviated from the prepared script and insisted on including a statement asserting that "nobody is discriminated against at Horizon," despite the segment's intended focus on Employee Appreciation Day. His tone during the unscripted remarks was notably stern and intimidating. Given the timing and context—particularly in light of her recent protected activity—Deberry reasonably believed that the comments were directed at her in an implicit act of retaliation. The footage in question was not included in the final edit.

64.    On February 27, 2024, Galanty emailed Deberry claiming the PR Manager had only expressed "feelings," but not any examples about the mistreatment of women of color, so she was not going to pursue a formal investigation. The same day, Deberry responded. She corrected Galanty that the PR Manager had not said that "women of color" were mistreated, but had specifically referenced Black women according to Galanty's own recounting of the HR exit interview. She also said that she felt "deeply violated" that Galanty had shared Deberry's comments not only with Smith-Wilson, but also with Koenigsberg, and that she now would have further difficulty being comfortable with Koenigsberg. She told Galanty that Galanty had been dishonest with her and caused her extreme distress.

65.    In May 2024, Horizon appointed HR representative Suzy Cummins to investigate what had happened in connection with the PR Manager's exit interview and Galanty's follow up.

66.    Both Deberry and Smith-Wilson met with Cummins. Deberry described what the PR Manager had told her and how she had corroborated the PR Manager's observations. She also discussed her concerns about Galanty's handling of the investigation, including the

broken promise of confidentiality, the failure to adhere to Horizon's stated policy, and the coercion to file a complaint. Smith-Wilson shared with Cummins what she knew. She noted that Galanty had categorized Deberry as "angry," which was an offensive racial stereotype.

67.     Deberry told Cummins that she intended to file a formal complaint against Galanty based on her mishandling of the internal inquiry and the resulting harm her actions caused. Deberry also expressed concern regarding the repeated characterization of her demeanor as "angry" or "upset"—noting that such descriptions were not only inaccurate, but also inappropriate and offensive. To support her concerns and promote awareness of the broader implications of such language, Deberry shared a Harvard Business Review article addressing the effect of racial stereotyping in the workplace, urging Cummins and her team to review the material and consider its relevance to their internal practices.

68.     In June 2024, Cummins confirmed to Smith-Wilson that Galanty had been involved in certain parts of the "discomfort along the way," referring to Deberry's complaints about Galanty, and had thus recused herself from the process.

69.     Upon information and belief neither Cummins, nor anyone else in HR, reached out to the PR Manager as part of this purported investigation.

70.     On July 9, 2024, Cummins emailed Deberry and Smith-Wilson that Horizon had concluded its inquiry. Without speaking with the PR Manager, Cummins claimed that there was a discrepancy between what the PR Manager shared with Deberry and what she said during her exit interview, said she was unable to corroborate what was said to Deberry about confidentiality, and said there was a "lack of clarity and conflicting feedback" about what was communicated among Galanty, Deberry, and Smith-Wilson. She stated that Horizon would be reviewing the exit interview process, the employee relations process including escalation to

leadership, policies and procedures in the handbook, organizational criteria for investigative process, and additional training for those involved, including in HR. Plaintiffs do not know if any of those steps were ever undertaken.

71.    In the email to Smith-Wilson on July 9, 2024, Cummins admitted in writing: "There is confusion as it relates to Human Resources process and the role of the DEI team in response to employee relations concerns and complaints"; "It is unclear what organizational criteria is used regarding the investigative process"; "There are gaps in Horizon's exit interview process"; and "There is a need for training to navigate the complex employee relations issues with leadership and the HRBP team." No further communication was sent regarding this matter or next steps.

72.    Smith-Wilson also previously had made several oral and written requests for someone (either herself or another leader) from the DEI team to be included on the Employee Relations Council, as it only included White executives. She believed it was important to bring various backgrounds and experiences to the Council to improve its depth of perspective on what are often sensitive and extremely nuanced issues. Neither she nor anyone on her team were ever included.

<u>The Discrimination and Retaliation Escalates</u>

73.    In July 2024, Horizon unveiled the latest evolution of its "biggest investment ever," Blu, a proprietary AI-native, connected marketing platform, during a Town Hall meeting. Smith-Wilson, despite being Chief Marketing & Equity Officer and expected to take a leading role in elevating its awareness and company positioning, learned about the status and new focus of such a critical part of the company's future for the first time during the Town Hall meeting, at the same time as all other employees.

74.    In August 2024, Koenigsberg began to accuse Smith-Wilson of being unfamiliar with Horizon's technology. He refused to acknowledge Smith-Wilson's proactive cross-team efforts and leadership following the Town Hall in working to obtain alignment from Horizon's leadership team on its technology narrative, differentiation, and readiness. He also accused her of not understanding technology when his statements conflicted with what the subject matter experts were saying about Horizon's technology, particularly regarding Horizon's new product Blu.

75.    In a meeting with Smith-Wilson on September 5, 2024, Koenigsberg told her that she was there to "serve our leaders." Smith-Wilson raised her eyebrows and repeated, "Serve?" Koenigsberg said, "Well, I guess that sounds subservient." Smith-Wilson agreed that it did. He then changed his phrasing to "service." This was similar to a statement made in December 2023 by Hunt, who told Smith-Wilson that she needed to "report to the Board." Smith-Wilson reminded Hunt that she was her peer, as well as the peer of every Executive Board member, and that they all reported to Koenigsberg. Smith-Wilson is not aware of any other Executive Board Member who was told to serve or report to their peers. Smith-Wilson is the only Black person to ever serve of Horizon's Executive Board.

76.    Throughout 2024, despite Deberry's significant and well-documented contributions to Horizon Media's communications strategy, Koenigsberg repeatedly minimized or dismissed her accomplishments. For instance, Koenigsberg referred to three of Deberry's social media strategies as "amateur" and commented that the goal she set "does nothing for [me]," despite her extensive professional background, including having led social media strategy at a nationally recognized media company and her recommendations reflecting proven best practices. Notably, the social media elevation initiative for Koenigsberg's personal brand stalled not due to any

deficiency on Deberry's part, but as a result of Koenigsberg's own repeated failure to follow up, his refusal to approve the hire of a dedicated social media editor, and his expressed desire to pause the project amidst declining business performance at Horizon—factors never acknowledged in his criticisms of Deberry.

77.     In September 2023, Koenigsberg had directed Deberry to develop a Wikipedia page about him. At the outset, Deberry advised that the task would be difficult due to the limited number of publicly available, third-party sources documenting Koenigsberg's personal and professional background—a requirement for Wikipedia approval. She recommended that the company prioritize placing additional articles highlighting Koenigsberg's accomplishments and biography in credible publications to establish a foundation for the page. Koenigsberg declined this approach and instead insisted that he would provide the content directly for Deberry to draft, though he never followed through with revisions to the original document. Despite his lack of engagement, he continued to assert that the project was urgent and demanded progress. Deberry and the former PR Manager were ultimately blocked from contributing by Wikipedia due to their financial affiliation with Koenigsberg, as per Wikipedia's conflict-of-interest policies. Deberry researched and proposed alternative solutions; however, in October 2024, Koenigsberg instructed her to cease work on the project, stating that he had engaged an external party to complete it. Thereafter, Koenigsberg implied that the lack of progress was the result of Deberry's failure to think critically or execute effectively. As of September 2025, Koenigsberg does not have an approved or active Wikipedia page.

78.     In October 2024, Deberry attended a partnership meeting exploring a potential collaboration with The Female Quotient, a global organization dedicated to advancing women in business. In her capacity overseeing thought leadership event strategy and placement,

Deberry recommended that Smith-Wilson be considered for participation on one of the panels to represent the company. Lord, a White male consultant newly introduced to Deberry at this meeting, immediately rejected the suggestion, stating that he did not want to "focus on DEI." Deberry, surprised by the dismissal, clarified that Smith-Wilson's expertise was in marketing and that her role extended well beyond DEI. Lord did not acknowledge or respond to Deberry's comment. This was not an isolated incident. Lord, along with other Horizon executives, repeatedly characterized Smith-Wilson, a Black woman, solely through the lens of DEI, despite her extensive background and leadership in marketing. Similarly, Horizon leadership, at times, mislabeled Deberry as holding a DEI function, even though her role was strictly focused on communications, and she has never worked in a DEI capacity in her career.

79.    In October 2024, Turner falsely claimed to lack knowledge about an analyst submission on which he had been included for three months. When Smith-Wilson pointed out that the statement was false, Koenigsberg chastised her for focusing on the wrong things.

80.    Similarly, on October 29, 2024, Koenigsberg told Smith-Wilson that "multiple people" had told him they were forced to write their own press releases. Smith-Wilson told him that was false. Koenigsberg told her that he did not "want a debate here." As always, Koenigsberg accepted whatever Smith-Wilson's White peers said, despite the lack of support for their claims, and either criticized her when she provided facts to set the record straight or did not respond when she asked follow-up questions to clarify.

81.    No one in Horizon leadership consulted with Smith-Wilson, or even told her, that a new Product Marketing team was being created, even though she was Chief Marketing & Equity Officer. In fall 2024, the team was established, under the leadership of Domenic Venuto, a White man. The Product Marketing team had no reporting relationship to Smith-Wilson,

although she frequently took the initiative to ensure her team was connected to Venuto's team to avoid duplication of effort, clarity regarding their product messaging and buildouts, and collaboration across the enterprise as needed. Although Horizon would not approve Smith-Wilson to hire anyone in a marketing role, the Product Marketing team was comprised of three executives—one  SVP and two VPs, three times more than Smith-Wilson's enterprise team.

82.    In the fall 2024, Horizon promoted two White men, Turner and Campanelli. Turner had widely been known as a "bad actor" within the company, previously being caught by Smith-Wilson numerous times knowingly communicating false information related to her team's performance and also named in the former PR Manager's exit interview for exhibiting hostile behavior in the workplace. Turner was also the President of Horizon Next, which was referred to as "The Cancer Within Horizon" in the September 2022 LinkedIn post. To Deberry and Smith-Wilson's knowledge, Turner never underwent any behavioral training, nor were any formal apologies issued to affected employees. Further, when Smith-Wilson raised issues regarding Turner's behavior or blatant falsehoods, Koenigsberg either dismissed her evidence or chastised her for speaking up for herself or her team.  Yet, Turner was given increased power and access across the enterprise.

<u>Horizon Begins a Full-Scale Attack on Plaintiffs</u>

83.    On November 25, 2024, Smith-Wilson's team presented its 2025 strategic plan. In prior years, those presentations were made to Koenigsberg, whoever was head of HR at the time, the Chief Operating and Financial Officer, and the Chief Development Officer. In 2024, however, two business days before the meeting, Koenigsberg told Smith-Wilson that he was inviting approximately ten additional executives—some Smith-Wilson's peers, others not—to review her team's work and provide feedback. As a result, Smith-Wilson and her team were forced

to revise the presentation to accommodate attendees who lacked familiarity with the strategic arc developed since 2022.

84.     From the outset of the November 25, 2024 meeting, Koenigsberg's tone was adversarial and hostile. When Smith-Wilson commented on the first slide that the team's intent was for Horizon to "set a new standard of excellence in the industry," Koenigsberg dismissed the goal as unrealistic and "ridiculous," even directing her to return to the first slide after she had moved on, specifically to attack this statement. Notably, when similar aspirations were later articulated by the Blu platform team in strategy materials or by Lord, a White man, during a public-facing company-wide meeting on April 3, 2025, Koenigsberg praised the ambition or listened without critique.

85.     Throughout the November 25 meeting, Koenigsberg continued to display hostility, particularly toward Smith-Wilson and Deberry. When Deberry attempted to present an overview of communications strategy, Koenigsberg switched to the subject of Blu, Horizon's new AI-native marketing platform. Koenigsberg belittled Deberry's contributions—even though she had successfully generated positive media coverage, secured strategic exposure opportunities, and advised on positioning the platform to withstand scrutiny. Koenigsberg asserted that Blu's limited traction was not due to its deficiencies, but rather to Deberry's alleged inability to understand or articulate its value. This accusation was made despite Deberry arranging a leading media outlet interview during which the reporter, referencing direct comments from Koenigsberg himself, confirmed that Blu was not competitive with offerings from other companies. The journalist declined to publish a feature, citing a lack of substance.

86.     During the same meeting, Koenigsberg threatened to quiz Deberry on Blu's technical specifications in front of the executive audience. Deberry declined, restating that she had

fulfilled her responsibilities and secured coverage opportunities, but that media professionals quickly identified critical gaps in the product's capabilities. Koenigsberg had never, to plaintiffs' knowledge, subjected a White male employee to such treatment. Similarly, Koenigsberg attempted to "threaten" Smith-Wilson in one-on-one meetings, telling her "Whether we agree or disagree on the tech side, there will be a test. You may not like that there will be a test." Yet, he was unable to provide any evidence or rationale for his claims that she was unaware of the company's products and technologies. In addition, subject matter experts supporting Blu had previously confided to Deberry and others on Smith-Wilsons's team that the platform was incapable of delivering on the capabilities Koenigsberg was publicly promoting. Internally, several senior leaders acknowledged that the company was engaging in misrepresentation to give the illusion that Blu was a cohesive and fully operational platform, despite it being in a developmental and disjointed state.

87.     Further, during the same meeting, Koenigsberg questioned the awards submission process, which Smith-Wilson had previously sent to him, he had approved, and Deberry was executing according to directive. Although Deberry was present, Koenigsberg referred to her in the third person rather than addressing her directly. Deberry felt compelled to assert her presence in the meeting by stating, "Charisma is present." He repeatedly exaggerated the pronunciation of her name, "Cha-RIS-ma," in a patronizing tone. Despite later praising the company's receipt of 14 awards in 2024—13 of which Deberry led or secured—during the November meeting Koenigsberg publicly claimed Deberry was failing in her awards responsibilities. This mischaracterization omitted critical context: Koenigsberg had explicitly instructed Smith-Wilson and Deberry not to submit applications for enterprise-wide awards due to low internal morale and negative business forecasts, advising them to revisit the strategy at a more opportune time.

88.     Koenigsberg was so hostile during the November 25, 2024 meeting that immediately after it, Deberry became physically ill and vomited. One team member broke down in tears during the team's post-meeting regroup. Another employee followed up with Deberry to express concern about her well-being and to question how such a meeting could be permitted under the company's policies and supposed values. Galanty, who is responsible for observing and correcting workplace culture, attended the November meeting and neither intervened nor followed up with Smith-Wilson or Deberry to address any concerns.

89.     As requested by Koenigsberg, on December 5, 2025, Smith-Wilson sent him a document prioritizing the items from the November 25 strategy presentation.

90.     In a conversation with Smith-Wilson on December 13, 2024, Koenigsberg told her that she should be reaching out to "a bunch of leadership, that's Donnie [Williams], that's Gene [Turner], that's Domenic [Venuto]. I can reel off five or six other people. Those are the people that you serve." All of those Koenigsberg named are White men and Smith-Wilson's C-Suite peers and fellow Executive Board members.  Yet, Koenigsberg repeated his position again that she was there to "serve" White male leaders, dismissing her position as their peer and intentionally degrading and minimizing her.

91.     In response to Koenigsberg providing her with accusatory and dismissive feedback, Smith-Wilson wrote to Koenigsberg about the unsubstantiated, secondhand comments being used to attack her and her team. In subsequent in-person conversations with Koenigsberg, Smith-Wilson set out the evidence of her and her team's performance. She also expressed concerns about his demeaning and dismissive language.

92.     On December 20, 2024, Koenigsberg told Smith-Wilson that the strategy she outlined during the November 25 meeting was taking on too much, and identified nine areas

for 2025 strategy on which to focus. Koenigsberg directed Smith-Wilson to review his strategy outline with everyone who attended the November 25, 2024 meeting. Smith-Wilson said she would do so, and asked that she be included in 2025 strategy sessions for those who had attended her meeting as well to gain early insights and ensure cross-functional alignment. Koenigsberg did not include Smith-Wilson on the invitations to other executives' strategy meetings, although he invited them to hers. Instead, he suggested she set up her own meetings with the executives, again dismissing her request and attempting to reframe the request as asking him to "set up" meetings for her.

<u>Lord Joins Koenigsberg in Discriminating and Retaliating Against Plaintiffs</u>

93.     Smith-Wilson worked closely with Lord over the course of her holiday PTO in December 2024 on the announcement for his new role as President of Horizon Media Holdings—developing the press release, messaging, organizational positioning, FAQ's, bylines, journalist outreach, and more. He praised her work in his onboarding communications and other engagements (ex. "Tra, These are great and come across very well regarding Horizon and its positioning. I don't have anything to add.")

94.     In January 2025, Horizon announced Lord as President of Horizon Media Holdings. All of Horizon's Executive Board (with the exception of the Chief Operating & Financial Officer), including Smith-Wilson, began reporting to him. Smith-Wilson shared with Lord the nine-point strategy on which Koenigsberg had directed her to focus. While her team's initial proposal had a broader scope of responsibility, she refined the plan to align with Koenigsberg's stated priorities, with Koenigsberg explicitly stating, "Tra I believe if we can follow this plan we will accomplish a lot."

95.     Lord did not respond to the email with the initial 2025 Strategy and revisions that Smith-Wilson emailed him in January 2025, and presented to him via video call on or around February 6, 2025, where he had minimal questions.   After Lord's review, he told Smith-Wilson that if Koenigsberg needed to see something to send it to him, which Smith-Wilson did.

96.     On February 11, 2025, having met or emailed with all the participants from the November 25, 2024 Strategy meeting, Smith-Wilson sent Koenigsberg an email stating that she had discussed the plan and aligned with the meeting participants and that no major gaps were uncovered in those conversations. She asked him to let her know if her team was now approved to move forward with the plan, which was attached.   Koenigsberg said that Lord would need to weigh in.  Smith-Wilson informed him that she had reviewed with Lord prior to sending Koenigsberg the final plan and attendee alignment.  Lord never responded to the email or referenced its contents until March 20, 2025.

97.     At the Consumer Electronics Show (CES) in January 2025, Koenigsberg exhibited overt hostility toward Deberry. He deliberately ignored her professional greetings and only acknowledged her to demand that he be filmed—despite his executive assistant having previously informed Deberry that he would not be available for filming during the event. Upon observing Koenigsberg's dismissive and inconsistent behavior regarding filming interview content, Lord remarked to the production crew, as well as to Deberry and Smith-Wilson, that Koenigsberg was being "difficult" and expressed frustration with his conduct. While Koenigsberg interacted warmly and collegially with other Horizon employees present at CES, his treatment of Deberry and Smith-Wilson, which was aloof and dismissive, stood in stark contrast. Notably, Deberry and Smith-Wilson were the only Black representatives from Horizon Media in attendance, reflecting a consistent pattern within the organization.

98.    In mid- February 2025, the final results of the 2024 diversity and culture survey were presented in a meeting with Koenigsberg, Galanty, and Lord. The results showed a slightly lower inclusion score and overall similar themes and issues from the prior year. It was thus clear that there were organizational trends. The year two results had been framed as critical for this purpose from the initial engagement. Koenigsberg again continued to try to discredit the survey results. Lord quickly joined in and called the core methodology into question. The co-founder and COO of the company that conducted the survey was present and forced to defend her company's credibility, despite having worked with some of the world's top companies. The VP of Diversity, a Black woman who reported to Smith-Wilson, later said that she felt embarrassed and attacked in the meeting. She asked, "having not yet even met me, at what point did [Lord] decide he didn't like me?"

99.    In March 2025, PR Week recognized Smith-Wilson as a Woman of Distinction, a "program celebrating the achievements of the PR industry's top women leaders, whose leadership, creativity and insight continue to inspire everyone who encounters them." Neither Koenigsberg nor Lord (nor Smith-Wilson's Executive Board peers) acknowledged this significant recognition.

100.    In March 2025, Deberry won a major industry award, having been named Campaign Inspiring Woman 2025. Rather than offering a straightforward congratulatory response, Koenigsberg conveyed a thinly veiled criticism, questioning the legitimacy of the award and subsequently imposing a requirement that Deberry submit all future award nominations for prior review and approval. This treatment stood in stark contrast to Koenigsberg's response to similar accolades received by White and/or male employees, whose achievements he consistently celebrated without condition. Koenigsberg had previously been aware of approximately 30 award

submissions—some involving very junior employees—yet had never requested to review Deberry's materials or raised concerns regarding their merit or process. The timing and tone of Koenigsberg's directive, issued immediately after Deberry's recognition, appeared retaliatory in nature. Notably, Deberry had nominated multiple women in more senior roles at Horizon for the award; however, the independent judging panel selected Deberry based on its own criteria.

101.    On March 20, 2025, during a one-on-one catch up meeting between Smith-Wilson and Lord, Lord communicated for the first time that he was disappointed with the 2025 strategy. Smith-Wilson reminded him that the strategy was at the specific direction of Koenigsberg. Lord ignored the history, of which he was fully aware, and continued to blame Smith-Wilson. In this conversation, for the first time, Lord also criticized Smith-Wilson's and her team's capabilities and contributions. Lord told Smith-Wilson that she did not know how to interact with executives like him. He also said, in an intimidating tone, that her team was "condescending" and he found it annoying. Smith-Wilson asked for examples. Lord said he would get back to her with examples, including emails, but never did so. He also claimed to uncover a team member marking a document to "educate Bob Lord" and took offense to it. Smith-Wilson asked Lord to furnish the document in question; he did not.

102.    On March 24, 2025, Lord sent Smith-Wilson a new set of marketing directives that were separate from, and in many ways in conflict with, the directives from Koenigsberg on which Smith-Wilson and her team had been working. The directives were also duplicative with the Product Marketing team, which Smith-Wilson told Lord was responsible for many of the deliverables he was now placing upon her team. When Smith-Wilson asked Lord questions and provided specific recommendations and suggestions in order to plan a path forward, he accused her of pushing back and expressed his further "disappointment." However, he did not

hold Venuto, the White male who was head of the Data & Product function and Product Marketing team, accountable for the very work they were responsible for delivering. Instead, he falsely blamed, criticized, and demeaned Smith-Wilson and her team.

103.    Horizon was in a six-month pitch for Spectrum, the largest account win for the agency in at least three years. About two weeks before news of the deal hit, media began calling Horizon asking about it. Smith-Wilson and Deberry kept Koenigsberg and Lord up to date on the media inquiries. On March 30, 2025, Lord sent Smith-Wilson and Deberry an email that the negotiations were ongoing, and the parties were getting close. He also wrote that Spectrum had drafted a joint press announcement for Horizon to use in the upcoming week. In these situations, a press release is a sure sign that a client had made its selection. However, when Smith-Wilson congratulated Koenigsberg and Lord about the deal, saying her team was not aware the deal had been reached, Koenigsberg replied, on March 30, 2025, that Horizon had not won yet and Spectrum would work on a joint press release in the coming week if they won.

104.    On the morning of March 31, 2025, Spectrum shared a joint press release with Horizon and the news of the deal broke that day. Koenigsberg and Lord not only sidelined Smith-Wilson and Deberry—the two employees responsible for press—but by concealing information and misleading them made it impossible for them to effectively carry out their roles.

105.    In late March and early April 2025, Smith-Wilson raised professional concerns about Koenigsberg's directive to disclose Spectrum's internal budget figure to press contacts "off the record." She advised against doing so, noting reputational risk and the potential for Spectrum to escalate if attribution surfaced. Koenigsberg dismissed her concerns and reiterated his directive. Smith-Wilson did not do it due to the potential risk and harm to her and Horizon's reputations.

106.     In April 2025, Deberry had a meeting with Turner, Julie Nayerman, Caroline Cook and Amanda Hamilton. Three of them are White, one is Asian, and all except Hamilton were present for the November 25, 2024 strategy meeting. During the meeting, they repeated false accusations previously made by Koenigsberg regarding Deberry's performance, often parroting his exact language, and replicating his adversarial tone. For example, Turner criticized Deberry for not submitting Horizon for consideration for "Best Place to Work" recognition. Deberry explained that Koenigsberg had explicitly directed her not to submit Horizon for consideration for the 2024 or 2025 award cycles, citing high employee turnover and low employee morale. Initially, the executives in the meeting responded with skepticism, implying that Deberry was being dishonest. Only after further discussion did Turner concede that he had not been aware of Koenigsberg's directive. Turner also falsely asserted that Deberry works on DEI, despite the fact that her official and actual responsibilities lie in enterprise communications. His tone, and the broader tenor of the meeting, was dismissive of DEI, and reinforced a recurring and troubling pattern at Horizon Media: the consistent reduction of Black women executives' professional identities to DEI roles, irrespective of their actual expertise and responsibilities. Additionally, the executives in the meeting disregarded Deberry's strategic recommendations and instead proposed that she take on clerical and remedial tasks inappropriate for her level, including allowing herself to be quizzed on industry awards. Deberry declined to participate in these demeaning and performative exercises, reinforcing that her communications responsibilities had been executed with diligence, professionalism, and documented results.

107.     In or about spring 2025, the Product Marketing team spent weeks creating a marketing plan for a Request for Information ("RFI") without sharing any information with Smith-Wilson's team. On or about April 2, 2025, Venuto sent Smith-Wilson an email saying the

RFI was an important initiative of Lord's and requested a marketing plan for it. However, Smith-Wilson and her team had not been told anything about it. Smith-Wilson and her team did not learn the full details of the RFI until the day it launched. Following Smith-Wilson's departure Deberry led an effort to secure an exclusive feature about the RFI process that was widely celebrated across the company.

108.    On April 4, 2025, Koenigsberg sent Smith-Wilson an email questioning what her team had been doing on messaging regarding tariffs, calling it an "all hands on deck" situation. However, on January 31, 2025, Deberry had shared with Turner and Lord a time-sensitive media opportunity relating to tariffs. Lord responded that Horizon should pass, as it did not have the expertise to comment effectively on the subject. Turner added that this was not an issue on which Horizon would be commenting. Prior to Koenigsberg's email on April 4, there had been no communication contradicting or reconsidering Lord's and Turner's directions, yet Koenigsberg framed it as a failure on the part of Smith-Wilson and Deberry.

109.    On Sunday, April 6, 2025, Koenigsberg emailed Smith-Wilson about a sensitive account departure and asked for her advice on how to handle it so the press did not perceive that they lost the review. Smith-Wilson promptly provided a plan, but Koenigsberg said they should think about it and see if they heard anything the next day. The next morning, Smith-Wilson alerted Koenigsberg that a trade publication had asked for comment on the matter and asked if he wanted her to execute her plan. Koenigsberg only asked the name of the reporter. Later, Koenigsberg told Smith-Wilson that he had reached out to the reporter and spoken with him.

110.    In early April 2025, Smith-Wilson and Deberry learned from media contacts that Koenigsberg had been calling and meeting with media contacts and asking if they had good relationships with Horizon. Koenigsberg did not tell Smith-Wilson or Deberry about

these calls or meetings. Because Smith-Wilson and Deberry did have good relationships with the media contacts, the contacts shared the information with them. Koenigsberg's actions nonetheless damaged Smith-Wilson's and Deberry's reputations in the industry, by signaling that the CEO did not trust or have faith in his communications team.

111.    On or about April 9, 2025, Smith-Wilson learned that Koenigsberg had met with the editor-in-chief for a leading trade publication the week prior and did not tell Deberry or Smith-Wilson. They learned of it only after speaking with the publication about another matter.

112.    Deberry led organizing a Media Open House for April 22–23, 2025—an event strategically designed to reintroduce Horizon Media Holdings' executive leadership and reposition the company's technology and data narrative to key members of the press. Despite the absence of a major product launch or headline announcement, the team successfully secured attendance commitments from over 20 top-tier journalists. Well in advance of the Open House, Deberry planned to provide comprehensive briefing materials and talking points to all participating executives. She also obtained calendar confirmations through their executive assistants and assured the leadership team that formal briefing documents would be circulated one week prior to the event. However, approximately one week before the Open House, Lord unexpectedly questioned both the timing of the event and his own preparedness. This was followed by a series of similarly abrupt emails from other senior executives, expressing parallel concerns. On April 14, 2025, Lord instructed Deberry to cancel the event, citing the company's lack of readiness to publicly unveil the Blu product, and referencing internal misalignment on the overarching technology narrative. Deberry strongly advised against cancellation, emphasizing the reputational risks such an action would pose to both herself and the company, particularly given the reputational capital she had invested in securing high-level media attendance. Smith-Wilson echoed Deberry's

concerns, noting the inconsistency between Lord's rationale and Horizon's existing public messaging, as well as emphasizing the success of prior similar efforts for the company's PR efforts and the team's relationship building capabilities.  Deberry was compelled to cancel not only the media interviews and editorial meetings, but also catering orders and all associated travel accommodations. Deberry had been scheduled to be in New York to lead the sessions in person. The abrupt cancellation—despite significant logistical planning and investment—was professionally damaging and eroded hard-won media goodwill. Lord instructed her to consider rescheduling the event for a later date.

113.    On April 15, 2025, Deberry requested PTO, citing the pattern of poor working conditions and the abrupt and irrational cancellation of the long-planned Open House. In her written request for time off, Deberry said that she would be using the time to prioritize her well-being, spend time with her family, and reevaluate her future with Horizon. Smith-Wilson approved the request.

### Horizon Fires Smith-Wilson

114.    Smith-Wilson had a scheduled one-on-one meeting with Lord set for April 16, 2025. When the meeting took place, Galanty also attended. Lord and Galanty told Smith-Wilson that Horizon was terminating her employment, effective April 25, 2025, due to a purported reorganization and the elimination of the combined marketing and equity roles. They said diversity would move under HR. They told Smith-Wilson not to attend any external events, even though she had a leadership role scheduled for the following day with an external partner for a "hackathon," an event where people gather to collaboratively design, build and test solutions—mostly through computer programming or engineering—to solve a specific challenge or explore new ideas.

115.    Deberry was on PTO when Horizon fired Smith-Wilson. Lord sent Deberry a text on April 17, 2025, asking her to join an emergency team meeting. During the meeting, Lord told Smith-Wilson's team that she would not be representing the company at any external events and that she had the "option" whether to communicate with them until her last day, April 25, 2025.

116.    At the hackathon event with the external partner on April 17, 2025, other executives, who had little to no involvement in the planning, attended, and Smith-Wilson's efforts were erased. Lord called the event "impressive."

117.    On April 18, 2025, Lord held a transition meeting with Deberry and another woman member of Smith-Wilson's team. Lord instructed the two women not to include Smith-Wilson in any future meetings or rely on her during the transition period "so as not to cause any more hurt feelings." His comments not only suggested that Smith-Wilson's departure was not voluntary, but also was based on a stereotypical and unfounded narrative that Smith-Wilson would behave emotionally. Deberry and others found that in their communications with Smith-Wilson, Smith-Wilson remained professional and composed.

118.    On April 21, 2025, Lord told Smith-Wilson's peers that she was "no longer with the company," although her employment had not yet ended.

119.    Smith-Wilson held a final team call with her team, all of whom are women, on April 25, 2025. During the call, the team members talked about the hostile work environment and identified male executive who contributed to the environment. They also noted the far greater resources allocated to departments that men run, such as Venuto's. One participant became emotional and cried.

120.    After the team meeting, Smith-Wilson had a call with Deberry and another Black woman on the team. Deberry and the other Black woman said they did not feel that Horizon was a safe space for Black women.

Ongoing Discrimination and Retaliation After Smith-Wilson's Firing

121.    When Smith-Wilson's employment ended, Horizon moved the DEI part of Smith-Wilson's team under Galanty in HR. The Black woman who led DEI had previously encountered issues with Galanty that were serious enough that Horizon paid for sessions for them with a mediator in 2024. Within three weeks of the announcement of the change in reporting structure, the Black woman leading DEI resigned from Horizon, without another job lined up. Horizon then immediately rehired her as a consultant to carry out the strategy developed under Smith-Wilson, as Galanty had no material experience in the function.

122.    After Smith-Wilson's departure, Deberry became Horizon's most senior communications leader. She also became the only Black executive at Horizon in an enterprise-wide role and the only Black woman in a high-visibility role with consistent C-suite engagement.

123.    After Smith-Wilson's dismissal, Deberry was placed under enormous pressure, as she became solely responsible for managing the full scope of communications across the entire enterprise. This included executive communications, media relations, internal communications, conference strategy and planning, as well as corporate social media. She was expected to fulfill these wide-ranging responsibilities independently, without any internal team support, formal leadership guidance, or acknowledgment in the form of a title change or compensation adjustment.

124.    Despite the material expansion of her role, Deberry received no promotion or pay increase. Deberry remains the only executive with full responsibility for a Holdings,

enterprise-level function who continues to serve with the title of Vice President; all others have higher titles.

125.    Throughout her employment with Horizon, Deberry was only allowed to hire one PR Manager, whom she was not permitted to replace after the PR Manager's resignation in early 2024. Other departments were allowed to hire PR support. While Smith-Wilson was still employed by Horizon, Koenigsberg repeatedly insinuated to her that Deberry was not good enough. However, all media results, which were significant year-over-year increases from before her arrival, were driven either by or under the supervision of Deberry.

126.    Throughout Deberry's tenure, she repeatedly experienced the erosion of her authority in favor of a White male consultant who reported directly to her. Despite her leadership role, following her delivery of strategic counsel to White and/or male executives, they frequently inquired about the consultant's opinion—effectively subordinating her guidance to that of someone in an external reporting capacity. This pattern signaled not only a lack of respect for the chain of command, but also an implicit devaluation of her professional judgment. For example, in May 2025, a White employee asked Deberry if her stated priorities had been "approved" by the consultant.

127.    Despite Deberry's demonstrated success in corporate communications, public relations, and her credentials as a published journalist and contributor to academic literature, both Koenigsberg and Lord repeatedly and unjustifiably questioned her writing capabilities. For example, when Deberry was preparing a press release for the company's hackathon, Lord condescendingly suggested she hire someone outside the organization if drafting it was "too hard" for her. Deberry completed and delivered the release within 24 hours. The press release was later praised by executives from the hackathon's partner organization, as "so well written." On another

occasion, when Deberry prepared a detailed interview briefing for Lord, he dismissed it and said he preferred Venuto to position it "correctly." Venuto reviewed it and called Deberry's responses "excellent."

128.    Despite Deberry's role, on April 28, 2025, Lord canceled Deberry's participation in the Possible Conference, a marketing conference for which Deberry developed and championed Horizon's participation, undermining months of strategic work. Deberry's travel expenses were non-refundable, so the cancellation wasted Horizon's money. The only other person from Deberry's department who was supposed to attend the conference then became sick and could not attend. Lord nonetheless continued to bar Deberry's participation. Although the employees who planned Horizon's participation in the Possible Conference were all women, only White men were sent to the conference to represent Horizon.

129.    After Horizon dismissed Smith-Wilson, Lord sent Deberry details about Horizon's evolving plans for the 2025 Cannes Lion International Festival of Creativity, one of the advertising industry's most prominent global events. In 2024 and 2025 Smith-Wilson had directed the marketing and communications teams to begin laying the groundwork for onsite client and prospective events and activations at Cannes. After months of exploratory work, Lord told Smith-Wilson to drop any custom plans, as Horizon would not be doing anything major at Cannes if Koenigsberg did not have mainstage presence. Smith-Wilson directed Deberry and others on her team to halt the work, but continue working with internal teams on partner meetings and opportunities that could give the appearance of a substantive Horizon presence. But less than a week after Smith-Wilson's dismissal, Lord made it clear that he had been working on plans for Cannes. Lord invited Deberry to join the Cannes delegation and emphasized the strategic importance of her presence at Cannes.

44

<u>After Plaintiffs Retained Counsel, Horizon Continued to Discriminate and Retaliate</u>

130.    On May 5, 2025, counsel for plaintiffs emailed a letter to Koenigsberg notifying Horizon that the firm was representing the plaintiffs for their race and gender discrimination, hostile work environment, and retaliation claims.

131.    On May 5, 2025, during a meeting with an external social media partner, the partner and Deberry explained that progress on the partner's work had been delayed by matters such as executive approvals and administrative processes. When Lord expressed frustration, the partner's representative stressed the importance of clear communication between their team and Lord and Deberry. Lord then repeatedly stated that he had "finally identified the problem," claiming that the "problem is that Charissma doesn't know our events." Nothing the partner had said placed blame on Deberry or suggested she did not know Horizon's events. Deberry rejected Lord's characterization, clarifying that she was broadly responsible for managing events, assigning executive coverage, and overseeing related social media. She also explained that when events fall outside her purview, timely communication is essential, and any lack thereof signaled a broader executive coordination issue. After the meeting, Deberry sent Lord an email expressing her disappointment and concern over his public remarks, saying his comments misrepresented her contributions and risked undermining her credibility with internal and external stakeholders. Lord did not respond to the email, nor did anyone from HR follow up.

132.    After Horizon received the letter from plaintiffs' counsel, Deberry was excluded from the Cannes planning process. She only learned of her exclusion after a colleague alerted her. When Deberry asked Lord about it, he said he had made a "strategic decision based on organizational needs," and did not explain why he had not shared that decision with Deberry. Although media relations was a core objective of Horizon's presence at Cannes, Horizon directed

that Deberry would support the event remotely, with a nine-hour time difference, and a White woman and an Asian woman—neither with any media experience—were assigned to oversee on-site press engagement. This confused media partners, who expected Deberry's presence and expressed concern over her absence, and potentially damaged Horizon's credibility by having a less-experienced representative take over Deberry's role. Deberry was the only Horizon executive with on-the-ground business responsibilities who did not attend Cannes.

133.    On May 6, 2025, Lord called Deberry and told her he had appointed a new Chief Marketing Officer, Crystal Park, an Asian woman. By the time Lord told Deberry, she had already heard the news from co-workers. Lord also said that a press release would be issued the next day. Although press releases were Deberry's responsibility, this was the first she was hearing about it. Lord said he worked on it with the White male outside consultant, and claimed he excluded Deberry because of confidentiality concerns. Lord had no basis for believing Deberry would have breached confidentiality.

134.    Deberry later learned that Galanty contacted the outside consultant about working on the CMO press release and instructed him not to discuss it with Deberry, as it was "confidential." The outside consultant assured Galanty that Deberry had always demonstrated the utmost professionalism in her dealings with the press. Deberry also learned that Lord, Galanty, Park, and the outside consultant met with a reporter without telling Deberry. This not only damaged Deberry's credibility with an important trade publication, but called her integrity into question with her new manager before she had even met her.

135.    After the call with Lord, on May 6, 2025, Deberry emailed him to express concern about her exclusion from the process. She reminded him that she led every major talent and client announcement, including his, with absolute discretion.

136.    On May 6, 2025, after the draft press release was shared with Deberry, she also raised concern with its content. Deberry was concerned because she thought that the draft suggested that Smith-Wilson, Park's predecessor, lacked the skill set to lead Horizon forward and that Smith-Wilson's role was not enterprise-wide, and framed her primary area of expertise as DEI. Horizon ultimately revised the press release.

137.    On May 7, 2025, Park's hiring received press attention that was clearly shaped by Horizon, as it aligned with the draft press release. Press reported that Park was the first CMO of Horizon Holdings, and said that Smith-Wilson was leaving the role just for the Horizon agency within Horizon Holdings. Neither was true.

138.    Lord directed Deberry to forward all press inquiries about Park's appointment and/or Smith-Wilson's departure to him, Galanty, and the outside consultant. She did so.

139.    Park is far less experienced than Smith-Wilson and has no experience in one of the core functions of the role, communications.

140.    The first time Deberry met with Park, on or about May 19, 2025, Deberry told her that she had raised complaints of discrimination and retaliation and had hired counsel.

141.    When Park began working at Horizon, she remarked to Deberry that she could not believe Deberry had accomplished so much by herself. She also questioned the role and resources of the Product Marketing team and said she would be hiring to expand the Marketing department under her.

142.    In mid-May 2025, Horizon won three important and prestigious industry awards, the Communicator Awards. Two were Awards of Excellence (the highest honor) for Employee Storytelling & Design for an external communications project entitled "25 in '25:

Trends on the Horizon." The third award was an Award of Distinction for "Horizon Media's Digital Destination Zoetrope." Both projects were work led by Smith-Wilson and others on Smith-Wilson's team, including Deberry. The awards recognize the high degree of strategic vision, creativity, subject matter expertise, and leadership of plaintiffs' work—the very qualities that the White men leading Horizon questioned. Indeed, Koenigsberg, Lord, and other White men in leadership had heavily criticized the Zoetrope website that won the award. Koenigsberg posted a LinkedIn post announcing the awards and congratulating the Horizon team for being recognized and Lord responded that he was "proud" of the work. Yet Koenigsberg and Lord were vocal critics of plaintiffs' work on these and other projects.

143.    By mid-to-late May 2025, Deberry noticed that Park was limiting her role. Park repeatedly involved the outside consultant in reviewing Deberry's work, even though the consultant had always reported to Deberry. Deberry was also concerned because Park's lack of experience in communications was obvious, as she did not know even basic terms or concepts and admitted she had never run a press room or major event. Park's lack of experience made Lord's decision to exclude Deberry from Cannes even more troubling. Deberry also received confirmation that Koenigsberg was continuing to speak to the media without involving her or even informing her.

144.    On May 28, 2025, Deberry sent an email to Park expressing concerns about retaliation, including the changes to her role and responsibilities, as well as her exclusion from major communications projects and information relating to them. Park responded with an email that mischaracterized communications with, and treatment of, Deberry, requiring Deberry to respond and set the record straight.

145.    In early June 2025, in a one-on-one meeting, Park expressed concern to Deberry about the emotional toll on Deberry of continuing to work at Horizon with pending claims. Park asked if HR had offered Deberry the option of paid leave while the situation was resolved. Deberry said that no one had reached out to her.

146.    Despite Park's expressions of concern, she continued to exclude Deberry from communications events, and at times ignored her during meetings. During one such meeting with Park and another member of the team, Lord walked into Park's office in New York and began chatting. Park muted the Zoom and mouthed to Lord that Deberry was in the meeting remotely; she then unmuted and changed the topic. After that meeting, Deberry again raised concerns in writing to Park about the pattern of her disparate treatment and said she needed to take the afternoon off for her mental health.

147.    On June 12, 2025, on a President's call, Lord said that Venuto and his team had not yet finalized the product roadmap and thus could not move forward with a data, product, or tech narrative. Lord said the work on key differentiators was still in progress and being handled via competitive analysis that remained incomplete. This was the exact same type of work Lord criticized Smith-Wilson for not completing, even though it was Venuto's responsibility. Lord was aware of all this when he fired Smith-Wilson, as she had raised these issues with him. Upon information and belief, in contrast to his treatment of Smith-Wilson, Lord is not holding Park accountable for this part of Venuto's responsibilities or these delays and Venuto has faced no adverse consequence for his team's significant delays in delivery.

148.    After Deberry raised concerns about potential retaliatory conduct with Park, on June 12, 2025, Park for the first time expressed that she was "disappointed" in Deberry's work, mirroring the language Lord used with Smith-Wilson just before firing her. Specifically, Park, at

4 a.m. Pacific Time, gave Deberry a deadline of noon the same day for materials to prepare executives attending Cannes. Deberry told her that because of other meetings she would not have the materials completed by noon. Instead, Deberry posted them at 2:26 p.m. Deberry was aware that the executives intended to prepare over the weekend, the first interviews were not until June 17, 2025, and when Park emailed her "disappointment" no executive had yet even tried to access the materials.

149.    Park's criticism of Deberry's work was unwarranted. For example, this criticism occurred after Park dismissed Deberry's suggestion to conduct press etiquette sessions and provide written instructions. After Lord responded favorably to the idea, Park included those topics in her executive brief for Cannes and directed Deberry to execute it. On June 13, 2025, Lord acknowledged receipt of Deberry's briefs and described the materials as "great."

150.    Despite Horizon's efforts to sideline Deberry, in advance of Cannes she secured exclusive interviews with executive editors of major industry publications to take place during Cannes and landed the most prestigious coverage of the event, a feature story in Ad Age. Other than Park, Horizon's entire Cannes delegation consisted of White executives.

151.    On July 7, 2025, Deberry had a call with Park and Henry Molner, Lord's new Chief of Staff. Molner is a White man. Under Smith-Wilson's leadership, Deberry discussed with Lord a podcast for him. The project was developed by Deberry and another woman on Smith-Wilson's team. On the call, Molner presented a podcast for Lord as a new idea that Molner was spearheading. Molner said he would be "guiding" Deberry through Horizon's executive communications strategy. Molner has no prior experience in executive communications, an area that is a core part of Deberry's job. Park did not express any surprise and said the Deberry would be "looped in" later.

152. In a subsequent meeting on July 7, 2025, that Park had with some of her team, the employee who had been working with Deberry on the podcast expressed concern when she heard about the latest developments. She challenged Park on her ongoing pattern of allowing top-down direction from Lord and Molner, without advocacy for her team's strategic role. Deberry echoed the other employee's frustration and said she found it difficult to remain composed in meetings where others are allowed to direct or teach her how to do her job, without any pushback or clarification from her manager. Deberry added that it is not only demoralizing but deeply emotional and exhausting. The other employee referred to Park's behavior as gaslighting. Park, seeing the emotional toll, suggested the team take off the rest of the day. It was only 11 a.m. Pacific Time. Deberry declined, noting that if she stepped away every time she was treated dismissively, she would never be able to do her job.

153. Later on July 7, 2025, Park set up another meeting with Deberry and the other employee who had spoken up. The other employee expressed concerns about Park's lack of leadership advocacy. She noted that their work was consistently marginalized, then repackaged and celebrated when voiced by others, namely men. Deberry added that their team, made up entirely of women, is consistently treated as executional rather than strategic, which is a pattern that deeply troubles her. When Park asked the other employee if she shared Deberry's sentiments, the other employees responded, "unequivocally, absolutely yes." Park encouraged them to escalate to HR if they truly believed the issue was systemic, but said she had not personally witnessed the trend. Deberry suggested she truly reflect on the interactions she had seen, because they were not imagining it. After the other employee left the call, Deberry told Park that she felt she was being treated differently. Park responded, "If we were having this conversation over drinks and I was your friend, I'd tell you to protect your mental health and take your destiny into your own hands."

Deberry understood that Park was suggesting that she quit. Deberry responded that she planned to continue to do her job to the best of her abilities because she had earned her seat there and would not walk away simply because it was uncomfortable for others. Park continued to press Deberry to "do something." Deberry clarified that she was, by continuing to do her job with excellence despite the inequity.

154.    On July 9, 2025, Park told Deberry that she would be denied PTO for two professional events she had previously cleared with Smith-Wilson, and for which she was not seeking any financial support from Horizon: a Black Women's leadership conference hosted by Alpha Kappa Alpha Sorority and Black Tech Week, where Deberry was expected to speak. Horizon has an unlimited PTO policy. Deberry wrote to Galanty asking for clarification of how the PTO policy was applied and a review of Park's statements and comments. Galanty said that Park "did not believe the events advanced Horizon's brand or business growth." On July 10, 2025, Park said that after speaking with Galanty, Deberry's PTO was approved. However, due to the delay Deberry had already missed the first session of the first conference.

155.    On July 31, 2025, Park sent Deberry an email that purported to be an "updated" outline of Deberry's role. The email contained implied criticism of Deberry's performance, with no reference to any specific problems. Deberry responded by email the same day, objecting to the unjustified criticism, noting that any uncertainty about her role was caused by Park and other executives, and included unrealistic deadlines that conflicted with the realities of Deberry's work. Park declined to respond to Deberry's email in writing. Instead, in a conversation on August 12, 2025, Park affirmed that she believes Deberry is dedicated to her role and performing well. However, Park's written communications continued to include implied criticisms, despite Park's repeated private reassurances to the contrary.

156.    On August 13, 2025, ADCOLOR announced that Deberry had been selected for the prestigious 2025 ADCOLOR Leaders Class, an honor bestowed on 30 senior professionals in entertainment, media, and technology who are considered to be leaders poised for positive executive accomplishments.

157.    In August, Park hired a Senior Vice President of Industry Trade Partnerships, Co-Marketing & Events, a new role that assumes several critical functions previously under Deberry's purview. The new SVP, who is White, has not yet begun working at Horizon. According to Park's strategic plan, this position is intended to serve as a lateral partner to Deberry, who continues to manage the entire communications department. Deberry has held her current role for nearly three years without a raise or title adjustment, reportedly due to budget constraints. Publicly available job postings list the compensation range  for the new position as between $230,000 and $500,000, significantly more than Deberry's current salary. With the hiring of the SVP, Deberry will be the only enterprise-level marketing leader in the company serving at the Vice President level.

158.    Park continues to engage in a pattern of excluding Deberry from matters that fall within her area of responsibility and then nonetheless blaming Deberry when the work done without Deberry's input is not well received. When any work Deberry does receives positive feedback, Park claims credit for it.

159.    The discrimination and retaliation against Deberry are ongoing and likely to continue after the filing of this Complaint.

<u>FIRST CAUSE OF ACTION</u>
<u>Section 1981: Race Discrimination</u>

160.    Plaintiffs repeat and reallege paragraphs 1 through 159 of this Complaint as if fully set forth herein.

161.    By the acts and practices described above, defendants have discriminated against plaintiffs on the basis of their race, including by creating a hostile work environment, in violation of Section 1981.

162.    Defendants have acted with malice and/or reckless indifference to plaintiffs' statutorily protected rights under Section 1981.

163.    As a result of defendants' discriminatory acts, plaintiffs have suffered, are suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

<u>SECOND CAUSE OF ACTION</u>
<u>State Law: Discrimination</u>

164.    Plaintiffs repeat and reallege paragraphs 1 through 163 as if fully set forth herein.

165.    By the acts and practices described above, defendants have discriminated against plaintiffs in the terms and conditions of their employment on the basis of their gender and race, including by creating a hostile work environment, in violation of the State Law.

166.    Defendants have acted intentionally and with malice or reckless indifference to plaintiffs' statutorily protected rights under the State Law.

167.    As a result of defendants' discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
### City Law: Discrimination

168.    Plaintiffs repeat and reallege paragraphs 1 through 167 as if fully set forth herein.

169.    By the acts and practices described above, defendants have discriminated against plaintiffs in the terms and conditions of their employment on the basis of their gender and race, including by creating a hostile work environment, in violation of the City Law.

170.    Defendants engaged in discrimination with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiffs' rights or conduct so reckless that it amounts to such disregard.

171.    As a result of defendants' discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION
### CA Law: Discrimination (Deberry Only)

172.    Plaintiffs repeat and reallege paragraphs 1 through 171 as if fully set forth herein.

173.    By the acts and practices described above, defendants discriminated against plaintiff Deberry on the basis of her gender and race, including by creating a hostile work environment, in violation of the CA Law.

174.    Defendants acted with malice and/or reckless indifference to plaintiff Deberry's rights protected under the CA Law.

175.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

FIFTH CAUSE OF ACTION
Section 1981: Retaliation

176.    Plaintiffs repeat and reallege paragraphs 1 through 175 as if fully set forth herein.

177.    By the acts and practices described above, defendants retaliated against plaintiffs for their opposition to unlawful discrimination under Section 1981 in violation of Section 1981, including by creating a hostile work environment.

178.    Defendants acted with malice and/or reckless indifference to plaintiffs' statutorily protected rights under Section 1981.

179.    As a result of defendants' retaliatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

SIXTH CAUSE OF ACTION
State Law: Retaliation

180.    Plaintiffs repeat and reallege paragraphs 1 through 179 as if fully set forth herein.

181.    By the acts and practices described above, defendants retaliated against plaintiffs for their opposition to unlawful discrimination in violation of the State Law, including by creating a hostile work environment..

182.    Defendants acted intentionally and with malice or reckless indifference to plaintiffs' statutorily protected rights under the State Law.

183.    As a result of defendants' retaliatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION
### City Law: Retaliation

184.    Plaintiffs repeat and reallege paragraphs 1 through 183 as if fully set forth herein.

185.    By the acts and practices described above, defendants retaliated against plaintiffs for their opposition to unlawful discrimination in violation of the City Law, including by creating a hostile work environment.

186.    Defendants engaged in retaliation with willful or wanton negligence, with recklessness, and/or conscious disregard of plaintiffs' rights or conduct so reckless that it amounts to such disregard.

187.    As a result of defendants' retaliatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION
### CA Law: Retaliation (Deberry Only)

188.    Plaintiffs repeat and reallege paragraphs 1 through 187 as if fully set forth herein.

189.    By the acts and practices described above, defendants retaliated against plaintiff Deberry for her opposition to unlawful discrimination in violation of CA Law, including by creating a hostile work environment.

190.    Defendant acted with malice and/or reckless indifference to plaintiff Deberry's rights protected under the CA Law.

191.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages unless and until this Court grants relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs respectfully request that this Court enter a judgment:

a.    declaring that the acts and practices complained of herein are in violation of the Section 1981, State Law, City Law, and CA Law;

b.    enjoining and permanently restraining these violations;

c.    directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiffs;

d.    directing defendants to place plaintiffs in the position they would have occupied but for defendants' discriminatory and retaliatory conduct and making them whole for all earnings and other benefits they would have received but for defendants' unlawful treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.    directing defendants to pay plaintiffs compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and damage to reputation;

f.    directing defendants to pay plaintiffs punitive damages;

g.    awarding plaintiffs their reasonable attorneys' fees and costs;

h.    awarding plaintiffs such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

i.    granting such other and further relief as the Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
      September 4, 2025

VLADECK, RASKIN & CLARK, P.C.


By:  /s Anne L. Clark
     Anne L. Clark
     Attorneys for Plaintiffs
     111 Broadway, Suite 1505
     New York, New York 10006
     (212) 403-7300